**NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, Appellant,**

v.

Lawrence H. GARRETT, III, Secretary of the Navy, Appellee.

No. 91–1432.

United States Court of Appeals, Federal Circuit.

Oct. 5, 1993.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Jan. 3, 1994.

John G. DeGooyer, Hopkins & Sutter, Washington, DC, argued, for appellant.

Peter G. Barber, Dept. of Justice, Washington, DC, argued, for appellee. With him on the brief were Stuart M. Gerson and David M. Cohen, Washington, DC. Also on the brief was Stephanie Cates-Harman, Dept. of Navy, Washington, DC. Of counsel was C. John Turnquist, Washington, DC.

Before MAYER, Circuit Judge, BENNETT, Senior Circuit Judge, and MICHEL, Circuit Judge.

MICHEL, Circuit Judge.

Newport News Shipbuilding and Dry Dock Company (NNS) appeals from the March 4, 1991 decision of the Armed Services Board of Contract Appeals (the Board or ASBCA), ASBCA No. 33244, 91–2 BCA ¶ 23,865, 1991 WL 41865, *reconsideration denied*, 91–3 BCA ¶ 24,132, 1991 WL 133263 (June 26, 1991), granting the government's motion to dismiss NNS' appeal for lack of subject matter jurisdiction. The ASBCA determined that NNS did not properly certify its claim to the contracting officer pursuant to Contract Disputes Act (CDA) section 6(c)(1), 41 U.S.C. § 605(c)(1) (1988), and its implementing regulation, Federal Acquisition Regulation (FAR) 33.207(c)(2), 48 C.F.R. § 33.207(c)(2) (1991). Because under the FAR, the NNS official who signed the certification was unqualified to do so, we affirm.

## BACKGROUND

On January 21, 1986, NNS submitted a claim to the Navy's contracting officer for "$8,414,054, which represents properly allowable and allocable contract costs arising out of the acquisition of NNS by Tenneco.... [And NNS claims] any and all unpaid monies that will accrue from the date of our calculation of the claim until this matter is resolved." NNS' Controller, Mr. John B. Burling, Jr., certified the claim. Upon the contracting officer's inquiry into whether Mr. Burling was a proper certifier under the CDA, NNS' Vice President of Finance, Mr. H.J. Lanese, replied that Mr. Burling "is authorized under the [CDA] to sign and certify any claims against the Government we may have. Mr. Burling is an elected officer of [NNS] having overall responsibility for the conduct of its affairs." Subsequently, the contracting officer issued a final decision denying the claim. At the time Mr. Burling certified the claim, he reported to NNS' Director of Finance who, in turn, reported to NNS' Vice President of Finance. In particular, Mr. Burling testified:

[A]s controller, I had *oversight* over a wide spectrum of various *accounting activities*, virtually all of the accounting activities, for the company. I was responsible for the general accounting department, which maintained the official books and records of the company and recorded all business transactions of the company.

I had responsibility for the financial reporting department which put together the company's monthly and annual financial reports, its annual business plan, its five year business plan, reviewed and approved all capital[ ] expenditure requests, all major investments that the company would make.

*At times*, I had responsibility for the company's internal budgeting and *cost reporting*, responsibilities of the accounts payable, the payroll department, the vendor analysis program, whereby we'd review sole source procurement from our suppliers.

... [A]ny branch of the government that would come in and review the companies' [sic] accounting records, I was the primary focus for relationships with government business personnel, government auditors.

I was responsible for *negotiating any overhead settlements with the contracting officer*, responding to all DCAA [Defense Contract Audit Agency] audit reports, reaching agreements with the contracting officer *on accounting issues*, preparing and working with the Tenneco people on putting together the *home office overhead* submittal, and responding to any audit reports that were issued by the Houston office[ ] of the DCAA.

(Emphasis added.) Referring to the instant claim, Mr. Burling also testified that he "worked in the development of the claim and directed the people who worked for [him], in preparing the claim."

An NNS letter to the Navy dated March 5, 1986 indicated that Mr. Burling had authority "to sign invoices pertaining to contracts with the Government." However, neither the letter and an attached list nor an internal memorandum dated October 22, 1985 listed Mr. Burling among the numerous persons authorized to sign contractual documents on behalf of NNS.

NSS subsequently appealed the contracting officer's final decision to the Board which dismissed for lack of jurisdiction, ruling that under the FAR, Mr. Burling was not qualified to certify the claim. The only issues appealed to us are whether the FAR is lawful, whether court constructions of the FAR apply retroactively, and whether Mr. Burling met its requirements.

## DISCUSSION

### I.

Section 609(b) of title 41 defines our standard of review for decisions of agency boards of contract appeals as:

> [T]he decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. § 609(b) (1988). While we cannot disturb fact findings supported by substantial evidence, *Fruin–Colnon Corp. v. United States*, 912 F.2d 1426, 1428 (Fed.Cir.1990), we review *de novo* the board's conclusions of law, *United States v. DeKonty Corp.*, 922 F.2d 826, 827 (Fed.Cir.1991). Whether or not the lower tribunal had jurisdiction is a question of law. *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1576 (Fed.Cir. 1992). As discussed below, proper certification is a jurisdictional prerequisite and, therefore, who can qualify under the FAR to certify a claim is also a question of law. *United States v. Grumman Aerospace Corp.*, 927 F.2d 575 (Fed.Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 330, 116 L.Ed.2d 270 (Fed.Cir.1991). *See also United States v.*

*Boeing Co.,* 802 F.2d 1390, 1393 (Fed.Cir. 1986) ("The interpretation of regulations which are incorporated into government contracts is a question of law which this court is free to resolve.").

### II.

In its briefs to this court and at oral argument, NNS urges the court to reverse or modify *Grumman* to the extent that it controls the disposition of this appeal. In effect, NSS, like the dissent, asks us to seek *in banc* treatment of this appeal. *See* Fed.Cir.R. 35(a).[1] However, especially in light of the court's formal refusal to rehear *Grumman in banc,* 927 F.2d at 581, and the long line of binding precedent *Grumman* followed, we determine that the instant appeal does not "require answer to a precedent-setting question of exceptional importance." Fed.Cir.R. 35(a). Nor is there a conflict requiring *in banc* resolution. All of our case law on the FAR is consistent with *Grumman.* Nor is there any Supreme Court decision in conflict with *Grumman.* Failing to find either threshold standard for hearing *in banc,* our panel is legally obligated to decide this appeal, applying the holding of *Grumman* as binding precedent. *Newell Cos., Inc. v. Kenney Mfg. Co.,* 864 F.2d 757, 765 (Fed.Cir. 1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc.*"), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989).

### III.

■ Turning to the substance of the present appeal, NNS emphasizes that the CDA established a statutory basis for the subject matter jurisdiction of the ASBCA. Since in

---

1. Federal Circuit Rule 35(a) provides:

 In banc consideration, whether upon initial hearing or rehearing, is an extraordinary procedure. Upon initial hearing, the case must require answer to a precedent-setting question of exceptional importance. On rehearing, the case must require either answer to a precedent-setting question of exceptional importance or resolution of a conflict between the panel opinion and precedent of the Supreme Court of the United States or of this circuit.

 Although only the court in banc may *overrule a binding precedent,* a party desiring to argue for overruling need not make a suggestion for hearing in banc but *may so argue in its principal brief and at oral argument,* relegating to the panel any request to be made of the active judges to decide the case in banc.
 (Emphasis added.)

NNS' view, it satisfied the statutory requirements for ASBCA jurisdiction, the ASBCA cannot dismiss its appeal for lack of jurisdiction. To the extent that FAR 33.207(c)(2) imposes requirements not specified in the CDA, NNS reasons, the regulation improperly circumscribes the ASBCA's statutory jurisdiction.

By assuming it met the statutory requirements for an appeal, NNS assumes the very issue we must decide. Moreover, NNS misstates the relationship between the CDA and FAR 33.207(c)(2). As we explained in *Grumman*, "[t]he statute, being silent on the question of the individual who may certify a claim for a non-individual contractor, leaves a gap." 927 F.2d at 578. FAR 33.207(c)(2) "is entirely consistent with" CDA section 6(c)(1) and "merely serv[es] to fill the gap implicitly left by Congress respecting *who* may certify pursuant to that section." *Id.* (emphasis in original). The regulation therefore does not impermissibly limit statutorily defined Board jurisdiction. Rather, it is a part of that definition and implements the statute. *See Ball, Ball & Brosamer, Inc. v. United States*, 878 F.2d 1426, 1429 (Fed.Cir.1989) ("The [CDA] merely provides that 'the contractor shall certify.' The regulation constitutes a reasonable explication of how the 'contractor' shall certify, *i.e.*, it identifies the individuals within the contractor's organization who properly may act for the contractor in certifying."). Even if NNS otherwise satisfied the statutory requirements for ASBCA jurisdiction then, NNS must still fulfill FAR 33.-207(c)(2) in order for the ASBCA to have jurisdiction under the CDA.

Nevertheless, NNS contends that Congress, in enacting the CDA, intended to eliminate agency power to "manipulate" ASBCA jurisdiction, and that FAR 33.207(c)(2) is antithetical to that objective. Applying the certification regulation, according to NSS, an agency "on the basis of its own interpretation of its own regulation, can challenge the subject matter jurisdiction of the forum that is adjudicating a contractor's claim against it." Brief for Appellant at 17. Contrary to the overall legislative objective of the CDA, NNS asserts, consistent, prompt, and efficient resolution of contractor claims will thereby be jeopardized. NNS overstates its case. The certification regulation is not peculiar to claims arising under Naval contracts. Rather, it is a government-wide regulation. Contrary to NSS' assertion then, the Navy is not interpreting "its own regulation."

FAR 33.207(c)(2) is prescribed as part of a comprehensive federal procurement system. *See* 41 U.S.C. §§ 405 & 405a (1988) (directing the Office of Federal Procurement Policy (OFPP) to promote uniform procurement practice for executive agencies). *See also* 48 C.F.R. § 1.102(b) (1991) ("The FAR is prepared, issued, and maintained, and the FAR System is prescribed, jointly by the Secretary of Defense, the Administrator of General Services, and the Administrator, National Aeronautics and Space Administration....").

NNS fails to point to, nor are we aware of, any Naval acquisition regulation implementing or supplementing FAR 33.207(c)(2) that conflicts with that FAR's provisions. Therefore, the Navy plays no part in the jurisdictional definition. It is controlled solely by the FAR and the FAR is not malleable and hence subject to the alleged manipulation. Indeed, "[t]he regulation is unambiguous" and, therefore, must be applied "as written." *Ball, Ball & Brosamer*, 878 F.2d at 1429. Moreover, NNS exaggerates the impact that a literal reading of the certification regulation may have in enabling manipulation of ASBCA jurisdiction. Indeed, a literal reading, because it is clear and hence the outcome is predictable, actually prevents manipulation by obligating the contracting officer and the contract board or Claims Court[2] to accept all properly certified claims. Contractors, too, will know whether their certifications are valid.

By requiring the certification of a high level or directly involved official, FAR 33.-207(c)(2) both protects the corporate contractor from potential liability for any fraudulent or inflated claims of less involved or lower level employees and deters submissions of

---

**2.** As of October 29, 1992, the United States Claims Court became the "United States Court of Federal Claims," pursuant to Title IX of the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506.

such claims. ("The certification requirement furthers an important objective of Congress by 'trigger[ing] a contractor's potential liability for a fraudulent claim under section 604 of [title 41],' ... and thus 'discourag[ing] the submission of unwarranted contractor claims.' "). *Grumman*, 927 F.2d at 579. As we indicated in *Grumman*, the certification requirement of the FAR strikes a reasonable balance among sometimes incongruent policy interests, and nothing in the CDA or the legislative history has been cited to us that directly or indirectly forbids it. 927 F.2d at 579. "In sum, the regulation being reasonable, this court may not substitute its own construction of the statutory provision on which it rests. Nor is the writing or amendment of regulations our proper role.... We are not privy to all of the agency's reasons for its regulation and lack the expertise developed over the years by the agency in dealing with all aspects of certification." *Id.*

## IV.

■ According to NNS, Congress did not authorize the government to promulgate binding regulations that could affect ASBCA subject matter jurisdiction.[3] As a result, NNS argues, FAR 33.207(c)(2) is no more than an interpretative regulation, which does not bind courts. NNS further contends that the Navy's contracting officer could and did waive the claim certification requirement by issuing a final decision in this case. NNS also asserts that the ASBCA effectively allowed the government to obtain recision of that final decision by securing dismissal of its appeal. Again, *Grumman* forecloses NNS' arguments.

---

**3.** Additionally, NNS asserts that the certification regulation does not have the force and effect of law because the OFPP did not provide an opportunity for notice and comment before promulgating the regulation. Brief for Appellant at 23. In fact, however, the OFPP gave notice of the availability of draft FAR part 33 and requested comment in the Federal Register. 46 Fed.Reg. 9669–70 (Jan. 29, 1981) (comments due on or before Mar. 31, 1981). On September 19, 1983, FAR 33.207(c)(2) appeared as FAR 33.007(c)(2) in the Federal Register in final form. 48 Fed.Reg. 42349, 42350 (effective Apr. 1, 1984).

**4.** In its opinion on NNS' motion for reconsideration, the ASBCA erroneously implies that *Grum-*

Despite NNS' arguments to the contrary, the OFPP had statutory power to issue FAR 33.207(c)(2). Section 607(h) of title 41 generally authorizes and directs the OFPP, "as may be necessary or desirable to carry out the provisions of [the CDA], to issue guidelines with respect to criteria for the establishment, functions, and procedures of the agency boards...." 41 U.S.C. § 607(h) (1988). *See* 41 U.S.C. §§ 405 & 405a. On its face, FAR 33.207(c)(2), which fills the gap Congress implicitly left regarding who may certify under section 6(c)(1) of the CDA, "is clearly within the congressionally delegated authority of the" OFPP. *Grumman*, 927 F.2d at 578.[4] Therefore, we must accord "considerable weight" to the agency's interpretation of a statute it is responsible to implement. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

■ NNS' characterization of the regulation as merely interpretative is without merit. The contracting officer consequently could not waive the binding requirements of the regulation. *Cf. Paul E. Lehman, Inc. v. United States*, 673 F.2d 352, 356, 230 Ct.Cl. 11 (1982) ("The contracting officer ... had no authority to waive a requirement that Congress imposed."). In addition, the contracting officer's powers are specified by the CDA, and are limited. Waiving jurisdictional prerequisites is not among them.

■ In pressing its waiver argument, NNS also fails to come to grips with the extensive precedent holding that proper certification is a "jurisdictional prerequisite".[5]

---

*man* did not decide whether FAR 33.207(c)(2) is substantive or interpretative. Reconsideration op. at 3. If not explicit, then at least a necessary implication of *Grumman* is that the regulation was issued under congressional authority. However, the ASBCA's unduly narrow view of *Grumman* did not affect NNS' rights and therefore cannot constitute reversible error.

**5.** Instead, NNS tries to draw an analogy to various boards of contract appeals' denials of government motions to dismiss for lack of jurisdiction because of the failure of contracting officers' final decisions to inform the contractors of their rights to appeal, which 41 U.S.C. § 605(a) (1988) requires. But board decisions do not bind us.

*See, e.g., United States v. Newport News Shipbuilding & Dry Dock Co.,* 933 F.2d 996, 998 (Fed.Cir.1991) (*NNS I*) ("Failure to comply with section 605(c)(1) . . . and its implementing regulations deprives the Board of jurisdiction to hear the claim."); *Grumman,* 927 F.2d at 579 ("It is well settled that the certification requirement is a jurisdictional prerequisite that must be satisfied by the contractor before it may appeal the contracting officer's claim denial."); *Ball, Ball & Brosamer,* 878 F.2d at 1428 ("Unless the contractor has submitted a properly certified claim to the contracting officer, there is no valid claim, the denial of which is an appealable decision of the contracting officer."); *Thoen v. United States,* 765 F.2d 1110, 1116 (Fed.Cir.1985) ("Congress has determined that submission of a certified claim to the contracting officer in the first instance is a jurisdictional prerequisite to filing a suit. . . ."); *Lehman,* 673 F.2d at 355 ("Unless [the certification] requirement is met, there is simply no claim that this court may review under the Act."). Moreover, a party may challenge the subject matter jurisdiction of a federal tribunal at any time. *See Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) (restating that federal courts have limited jurisdiction); *Phillips v. General Servs. Admin.,* 924 F.2d 1577, 1579 (Fed.Cir.1991) ("A jurisdictional matter can be raised at any stage of a judicial proceeding by any party or by the court on its own motion."). Accordingly, the contracting officer could not waive the certification requirement by issuing a purportedly final decision and thereby create ASBCA jurisdiction despite the contractor's noncompliance with section 6(c)(1) of the CDA and FAR 33.207(c)(2). In this regard, we agree with NNS that neither a contracting officer nor any other agency official can alter a board's prescribed jurisdiction.

■ By assuming that the contracting officer has issued an appealable decision under the CDA, NNS ignores the premise for the conclusion that certification is a jurisdictional requirement. That is, although section 8(d) of the CDA directs a board "to decide any appeal from a decision of a contracting officer," for claims more than $50,000, 41 U.S.C. § 607(d) (1988), a contracting officer may issue a decision *only* after "receipt of a submitted certified claim." 41 U.S.C. § 605(c)(2) (1988). Absent appropriate certification, the contracting officer has no CDA claim on which to issue any decision. *Ball, Ball & Brosamer,* 878 F.2d at 1428 ("Unless the contractor has submitted a properly certified claim to the contracting officer, there is no valid claim, the denial of which is an appealable decision of the contracting officer."); *Lehman,* 673 F.2d at 355 ("[U]nless a claim has been properly certified, it cannot be considered under the [CDA]."). [6] Therefore, the Navy contracting officer never rendered a decision appealable to the ASBCA because NNS had failed to properly certify its claim. There is therefore no valid contracting officer decision for the government to "rescind" or on which NNS could base its waiver argument.

To bolster the waiver argument, NNS points out that the contracting officer issued the purported final decision after requesting and receiving documentation from NNS concerning Mr. Burling's qualifications to certify the claim. But whatever the contracting officer did or did not do, those actions cannot change Mr. Burling's factual status within NNS, or its legal consequences under the FAR and the CDA. Moreover, the fact that NNS represented to the contracting officer that Mr. Burling was a proper official to certify under the CDA actually undercuts NNS' waiver argument. In the words of

---

And the factual and procedural context of section 605(a) cases is distinguishable. Any harm is to the contractor, so the government may lack standing to file such motions. In any event, this failure of notice has no logical connection to whether a board has jurisdiction. Thus, it is not clear how the requirements of section 605(a) can be considered jurisdictional. Certainly, there is no decision of our court so holding.

**6.** NNS seems to contend that *Lehman* erred in holding the CDA certification provision to be jurisdictional. Brief for Appellant at 11 n. 7. Presumably, the unbroken line of cases based on *Lehman,* including *Grumman* and *Ball, Ball & Brosamer,* per NNS is similarly wrong. We disagree. In addition, we have no basis to upset this well reasoned and binding precedent, and NNS has presented neither persuasive arguments nor authority for us to do so.

NNS' Vice President of Finance, "Mr. J.B. Burling, Jr. is authorized under the [CDA] to sign and certify any claims against the Government we may have ... [and has] overall responsibility for the conduct of [NNS'] affairs." Yet, it is undisputed he could only sign invoices, not contract documents. Ironically, NNS now attempts to impute its own unfounded legal conclusions to the government when facts within its knowledge actually undercut those conclusions. NNS knew that Mr. Burling was *not* authorized to sign contract documents or even related documents, except for invoices. We cannot accept NNS' waiver argument.

### V.

■ NNS next challenges the ASBCA's application of *Grumman* as an impermissible retroactive application of a *new* construction of FAR 33.207(c)(2). NNS reasons "that a 1991 interpretation of the regulation should have no bearing on the propriety of a 1986 certification." Brief for Appellant at 30. Not only does NNS see *Grumman* as establishing a new interpretation of the FAR, but NNS also argues that retroactively applying *Grumman* would conflict with the purpose of the *Grumman* holding and produce gross inequities.

However, under the rule adopted by the Supreme Court in *James B. Beam Distilling Co. v. Georgia,* — U.S. —, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), which defines the contours of *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), NNS' legal authority for its non-retroactivity argument, actually precludes NNS' argument. NNS' failure to discuss *Beam* in its opening brief is unfortunate. Its failure to cite *Beam* in its reply brief is inexplicable. since the government relies heavily on that case in its response brief. Even assuming, *arguendo,* that *Chevron v. Huson* permitted *ad hoc* court adjustments of ASBCA jurisdiction and that *Grumman* diverged from existing law, the *Grumman* court indisputably applied its construction of the terms of the FAR to the contractor before it. 927 F.2d at 580–81. This fact alone brings our inquiry to an end and defeats the retroactivity argument. *Beam,* — U.S. at —, 111 S.Ct. at

2446 ("[T]he question is whether it is error to refuse to apply a rule of federal law retroactively after the case announcing the rule has already done so. We hold that it is, principles of equality and *stare decisis* here prevailing over any claim based on a *Chevron Oil* analysis."). Both the ASBCA and this court must apply the *Grumman* standards because those standards were applied to *Grumman* itself. Considerations of the purpose of the *Grumman* holding and equities are immaterial. *Id.* — U.S. at —, 111 S.Ct. at 2448 ("[W]hen the Court has applied a rule of law to the litigants in one case it must do so with respect to all others not barred by procedural requirements or res judicata."). In any event, *Grumman* was hardly new; it merely followed *Ball, Ball & Brosamer* on the legality of the FAR requirement to apply it literally, and its jurisdictional effect.

### VI.

■ Finally, NNS argues that Mr. Burling actually met the requirements of FAR 33.207(c)(2) as interpreted in *Grumman.* Our precedent provides a clear guide in analogous facts to evaluate NNS' compliance argument. In *Ball, Ball & Brosamer,* we determined that the contractor's Chief Cost Engineer, whose authority and responsibilities were limited to the cost and claim aspects of contracts, did not meet either FAR standard because he was neither in charge of contract performance nor vested with overall responsibility for the contractor's affairs. 878 F.2d at 1427. Similarly, Grumman's Senior Vice President and Treasurer who "decid[ed] and report[ed] on whether particular dividend-like costs were employee compensation chargeable to a series of government contracts" was held not to be a proper certifying official under either prong of the FAR. *Grumman,* 927 F.2d at 580. Relying on *Ball, Ball & Brosamer,* we explained that an individual with overall responsibility just for a company's *financial* affairs does not satisfy FAR 33.207(c)(2)(ii), which requires overall responsibility for the contractor's affairs generally. *Grumman,* 927 F.2d at 580. By contrast, however, we determined in *NNS I* that NNS' sole Executive Vice Presi-

dent, "directly under the Chairman and President and above other corporate officers and officials," presumptively possessed such "overall responsibility." 933 F.2d at 998 n. 2.

Insofar as NNS asserts Mr. Burling fits within the description of FAR 33.207(c)(2)(i), we are not persuaded because we cannot distinguish Mr. Burling from the officials in *Ball, Ball & Brosamer* and *Grumman*. Under the first prong of the regulation, a proper certifier would be "[a] senior company official in charge at the contractor's plant or location involved." 48 C.F.R. § 33.-207(c)(2)(i). This "description demands that the certifying senior company official have both primary responsibility for the execution of the contract *and* a physical presence at the location of the primary contract activity." *Grumman*, 927 F.2d at 580 (emphasis in original).

The record[7] contains absolutely no evidence that Mr. Burling had "primary responsibility" for contract performance. In fact, Mr. Burling as company controller only "had oversight over a wide spectrum of various accounting activities." That an affidavit asserted he was "vested with unrestricted authority to certify and submit [NNS'] claim to the Contracting Officer" is insufficient to establish primary responsibility for contract performance. *See Ball, Ball & Brosamer*, 878 F.2d at 1428 (finding authorization to sign and certify claims, by itself, inadequate). Moreover, the record does not indicate that Mr. Burling had any physical presence at the primary location for contract performance as specifically required by *Grumman*. 927 F.2d at 580. In this regard, Mr. Burling is identical to the *Grumman* official. *See* 927 F.2d at 580. NNS' evidence which shows that Mr. Burling was in charge of and located at the accounting department at NNS headquarters, but does not also show that the accounting department was the primary location of contract activity, is inadequate. Obviously, Mr. Burling was not present at the shipbuilding slip. Notwithstanding that the claim may involve accounting issues, those issues

are incidental to an underlying contract with the government. Given that the purpose of FAR 33.207(c)(2) is to assure that only knowledgeable, accountable and responsible corporate officials submit claims, the regulation reasonably identifies the relevant situs as the place where the contract is primarily executed. Substantial evidence supports the ASBCA's determination that Mr. Burling did not satisfy FAR 33.207(c)(2)(i), and the determination is neither arbitrary nor capricious nor tainted with fraud or bad faith. To the extent it is derivative of factual findings, all of them are supported by substantial evidence. As a legal conclusion, it is not erroneous.

Alternatively, "[a]n officer or general partner of the contractor having overall responsibility for the conduct of the contractor's affairs" would also be a proper certifier for a CDA claim. 48 C.F.R. § 33.207(c)(2)(ii). By the plain language of the regulation, the person must have responsibility of general scope. *Grumman*, 927 F.2d at 580. We find the ASBCA's determination that Mr. Burling did not have such "overall" authority within NNS is legally correct and rests on substantial evidence. Much like the facts of *Ball, Ball & Brosamer* and *Grumman*, Mr. Burling's own testimony details responsibility limited solely to various accounting and financial matters. In contrast to the *NNS I* Executive Vice President, Mr. Burling, the company controller, had no apparent overall authority or responsibility. Indeed, NNS' March 5, 1986 letter to the Navy and attached list and the NNS internal memorandum of October 22, 1985 indicate Mr. Burling may not even sign contracts or contract-related documents on behalf of NNS, but may only "sign invoices pertaining to contracts." Invoices do not involve disputed monies; claims do. Therefore, Mr. Burling's specified actual authority was limited both in breadth and height—surely inconsistent with overall responsibility.

■ In the face of this substantial evidence, NNS merely stresses that Mr. Bur-

---

7. Although the ASBCA questioned the propriety of NNS' submission of Mr. Edward J. Campbell's affidavit with its motion for reconsideration, the ASBCA apparently considered that evidence in rendering its decision and did not otherwise exclude this evidence or strike it from the record. Reconsideration op. at 2–3. Mr. Campbell's affidavit is thus both part of the record before us and the ground of the Board decision we review.

ling was an elected corporate official, yet fails to discuss the record detailing what Mr. Burling could do and not do and how the ASBCA reversibly erred in view of all the evidence. An elected corporate officer does not automatically qualify as a proper certifying official under FAR 33.207(c)(2)(ii). All corporate officers do not necessarily have "overall" authority for the corporation's affairs. The regulation requires us to look beyond official titles and to the breadth of the certifier's responsibilities. Similarly, we must look behind conclusory and self-serving post-certification assertions made by the contractor only when challenged, as here, that the individual has "overall responsibility for the conduct of the contractor's affairs." As in *Ball, Ball & Brosamer* and *Grumman,* the duties of the certifying official here plainly were limited, not general. Mr. Burling was responsible only for financial and accounting matters, and even then was three levels down from the top financial official.[8] Those limited duties belie the naked assertion of overall responsibility. In light of the evidence, we cannot say the ASBCA's determination that Mr. Burling did not satisfy FAR 33.207(c)(2)(ii) is arbitrary or capricious, shows fraud or bad faith, or is unsupported by substantial evidence.[9] Nor, in light of the holding of *Grumman,* can we say that in discerning or applying the FAR standards, the Board committed legal error.

## THE DISSENT

### I. *Rule 35 Standards for In Banc Review*

■ The dissent asserts that this case should be taken *in banc* to reevaluate *Grum-*

*man* because "circumstances have changed dramatically [since the court's refusal in 1991 to rehear *Grumman in banc* ] as a result of *Grumman*'s many adverse effects on government contracting practice." Dissent, at 1565. In support of its position, the dissenting opinion repeats at great length many "reactions by the bench, the bar and the administrative community in opposition to *Grumman* and the efforts to vitiate its stultifying effects on Federal Government procurement." *Id.* at 1565. The dissent concludes that *Grumman* "should be revisited in light of the growing amount of criticism leveled at it and the successful legislative and pending regulatory efforts to circumvent it." *Id.* at 1565.

Conspicuously missing from the lengthy dissenting opinion, however, is any independent legal analysis of why, in light of regulatory and statutory language and legislative history, *Grumman* was wrongly decided or how its rationale that the FAR is a reasonable ("permissible") interpretation of the CDA deserving deference under *Chevron* is fatally flawed. While such a showing, even assuming it could be made, might justify revisiting *Grumman in banc,* the alleged "many adverse effects on government contracting practice," *id.,* do not. Nor do "the growing amount of criticism" or legislative and regulatory revision efforts. Revisiting *Grumman* on the basis of the public criticism repeated uncritically by the dissent would substantially deviate from the only two bases allowed by Fed.Cir.R. 35 and would establish a new standard for *in banc* review, *i.e.,* if

---

**8.** NNS contends that *Grumman* held that the certifying official's position in the chain of command is pertinent only to FAR 33.207(c)(2)(i). Since the ASBCA relied on the chain of command evidence in the FAR 33.207(c)(2)(ii) inquiry, NNS argues that it committed reversible error. NNS misconstrues *Grumman. Grumman* did not reject the relevance of the certifier's position in the chain of command to FAR 33.207(c)(2)(ii). In fact, the *Grumman* court did consider but not rely on chain of command evidence to decide the "overall responsibility" question, finding the certifier unqualified primarily because he only had financial duties. Nevertheless, a certifying official's position in the chain of command may clearly be material to whether the person has overall responsibility. Moreover, given

en Mr. Burling's own testimony concerning how limited his duties were, any ASBCA error did not harm or prejudice NNS.

**9.** NNS faults the ASBCA, when analyzing the requirements of FAR 33.207(c)(2)(ii), for considering the number of people to whom Mr. Burling was subordinate. NNS again contends such fact is only relevant with respect to the "in charge" inquiry of the first prong, *i.e.,* FAR 33.207(c)(2)(i). As noted *supra,* this fact is actually relevant to both parts of the FAR, although no cases specifically so hold. In any event, because Mr. Burling did not otherwise satisfy FAR 33.207(c)(2)(ii), the ASBCA at most committed harmless error.

enough industry, bar or academic commentators complain vociferously enough about a panel decision, on that basis alone we will rehear the issue *in banc.*

The dissent implies that this case requires an answer to a question of exceptional importance, citing Fed.Cir.R. 35. *Id.* at 1573. First, the dissent omits half the explicit requirement of Fed.Cir.R. 35. In addition to being of exceptional importance, the question must be "precedent-setting." But here the precedent had already been set in *Ball, Ball & Brosamer,* two years earlier, and in even earlier cases of both the Federal Circuit and one of its predecessor courts, the Court of Claims.[10] Nor is there a conflict, the *only* other authorized basis for *in banc* rehearing, between *Grumman* and other panel decisions of our circuit or the Supreme Court. On the contrary, *every* other Federal Circuit panel that either before or after *Grumman* has reviewed the FAR has, like the *Grumman* panel: (1) upheld it as lawful, (2) found it jurisdictional,[11] and (3) applied it literally. *See, e.g., Kiewit/Tulsa–Houston v. United States,* 981 F.2d 531 (Fed.Cir.1992); *NNS I,* 933 F.2d 996; *Universal Canvas, Inc. v. Stone,* 975 F.2d 847 (Fed.Cir.1992); *Ball, Ball & Brosamer,* 878 F.2d 1426. That is all we do today. Nor has the Supreme Court ever treated the *Grumman* issue. In fact, the closest it ever came was in denying certiorari in *Grumman* itself.

No precedent-setting question is answered herein. Nor does our decision conflict with any binding precedent. Thus, *in banc* review would violate our rule. Therefore, as a panel we have no basis to request it.

Moreover, the court's decision in *Grumman* in 1991 did not create the effects decried by the dissent, as it implies. Rather the FAR itself created the problems when in 1980 it was written more narrowly than necessary or perhaps wise. *See* 32 C.F.R. § 1.314 (1981) (referencing promulgation date of Aug. 24, 1980) (redesignated at 50 Fed.Reg. 2270 (Jan. 15, 1985) as 48 C.F.R. § 33.207). That the regulation could have been drafted differently (and more wisely) does not make it invalid under a *Chevron* analysis as unreasonable or impermissible in light of the statute it implements and the legislative history. Only conflict with the statute it implements or clearly expressed legislative intent could make the FAR unreasonable under *Chevron.*

*Grumman,* like *Ball, Ball & Brosamer,* merely applied the plain meaning of the FAR after upholding it as a reasonable interpretation of the CDA. The regulation "merely ... fill[s] the gap implicitly left by Congress respecting *who* may certify pursuant to [the CDA]." *Grumman,* 927 F.2d at 578. In such a case, *i.e.,* where "the legislative delegation to an agency on a particular question is implicit rather than explicit[,] ... a court may not substitute its own construction of a statutory provision for a *reasonable* interpretation made by the administrator of an agency." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782 (emphasis added). The regulation must be deemed a "permissible construction of the statute," *id.* at 843, 104 S.Ct. at 2782, and reasonable if it is not "contrary to clear congressional intent." *Id.* at 843 n. 9, 104

10. The dissenting judge himself joined in the unanimous panel opinion in *Ball, Ball & Brosamer,* the 1989 Federal Circuit decision heavily relied on and frequently cited as controlling in *Grumman.* While *Grumman* applied the FAR to another type of official, *Ball, Ball & Brosamer* had once again previously (1) upheld the FAR as permissible under the CDA; (2) once again found compliance with it a jurisdictional prerequisite; and (3) applied it literally to a Chief Cost Engineer. Therefore, it was *Ball, Ball & Brosamer,* which our brother then joined, not *Grumman* about which he now complains, that created the requirement of literal compliance with the FAR in our precedent. *Ball, Ball & Brosamer* also continued the rule established over 10 years ago by the Court of Claims that proper certification is jurisdictional. Of course, Court of Claims deci-

sions are binding precedent on us as they were on the *Ball, Ball & Brosamer* and *Grumman* panels. Needless to say, our panel is also bound by *Ball, Ball & Brosamer* itself.

11. The dissent argues that the certification requirement should not be deemed jurisdictional in light of the language of the statute. As we explain *infra* in Section III, however, the dissent's argument is not correct for the literal language of the two applicable sections, taken together, actually requires proper certification of large claims in order for the contracting officer to have jurisdiction to render a valid final decision, an express statutory prerequisite to an appeal to a contract board or a suit in the Claims Court.

S.Ct. at 2781 n. 9. *See Pauley v. Bethenergy Mines, Inc.,* ―― U.S. ――, ――, 111 S.Ct. 2524, 2536, 115 L.Ed.2d 604 (1991) (determining reasonableness of agency's interpretation of its own regulation by considering congressional intent). Thus, as our court itself has recognized, the regulator's implementation of the statute must be upheld unless it " 'contravenes clearly discernible legislative intent' or is otherwise unreasonable." *True v. Office of Personnel Management,* 926 F.2d 1151, 1155 (Fed.Cir.1991) (quoting *Beneficial Corp. v. United States,* 814 F.2d 1570, 1574 (Fed.Cir.1987) (quoting *American Lamb Co. v. United States,* 785 F.2d 994, 1001 (Fed.Cir. 1986))).

 Thus, the *Grumman* court had, and we have, no authority to second guess the drafters of the FAR so long as the FAR is deemed reasonable. As explained below, the FAR is not inconsistent with expressed congressional intent, but instead properly implements congressional intent by specifying who may certify a claim, and does so in a way that promotes primary statutory goals: liability for civil fraud and deterrence of filing of inflated claims. As stated in *Grumman,* "the regulation is not unreasonable, and ... it is in furtherance of congressional objectives...." 927 F.2d at 579. As such, the FAR and the statute are what need to be revisited, not *Ball, Ball & Brosamer* or *Grumman* or the earlier precedent of this court or the Court of Claims.[12] Fortunately, the FAR and the statute have now been amended, as the law requires, by their makers, not this court. This court is empowered to rewrite neither statutes nor regulations, however unwise, nor does it have the information base nor expertise to do so effectively.

## II. *Deficiencies in Criticisms Cited by the Dissent*

We are reluctant to repeat all the heated criticisms by others which are quoted so extensively and repetitively in the dissent, lest the reader assume thereby that we agree they have arguable legal or interpretive, as opposed to political or policy, merit, or are at all relevant to whether the holding of *Ball, Ball & Brosamer* and *Grumman* and their many predecessors may and should now be overruled *in banc.* However, we cannot fail to point out that many of the criticisms of *Grumman* are entirely unsupported and unsupportable.

A. *Litigation statistics.* The dissent recites ASBCA statistics for 1991 as evidence of a sudden and dramatic post-*Grumman* increase in litigation over who may certify claims on behalf of corporate contractors. But no comparable figures are given for pre-*Grumman* years. Therefore, the inference of a sharp increase caused by *Grumman* is hardly established. Nor is it clear whether any increase was caused by *Grumman* in 1991 as compared to *Ball, Ball & Brosamer* in 1989.

Besides, the volume of cases which discuss certification is probative only of the number of times the government has moved to dismiss appeals on that basis. That the plain language of the 1980 FAR raises a serious issue in so many cases certainly cannot establish that *Ball, Ball & Brosamer* and *Grumman* were wrong or that the FAR is unreasonable. It may prove only how often contractors ignored the plain and specific terms of the FAR, although it was promulgated in 1980 and not changed for 13 years. Indeed, how a 1980 FAR can be said in 1991 to have created "a trap for the unwary," as asserted in the dissent, is difficult to follow. In any event, even assuming a sharp rise in cases raising the certifier issue, that fact could not establish that the *Ball, Ball & Brosamer–Grumman* constructions of the FAR themselves conflict with the CDA.

---

**12.** A majority of the court has already expressly declined *in banc* review of *Grumman,* 927 F.2d at 581 n. 1. Only four of 10 active judges voted to take *Grumman in banc.* Moreover, like the *Ball, Ball & Brosamer* panel, the *Grumman* panel was unanimous. Nor are the three members of the *Grumman* panel the only judges of our court to have ruled consistently with *Grumman.* Three other judges unanimously joined a similar interpretation in *Ball, Ball & Brosamer.* Two more judges did so in *Universal Canvas,* 975 F.2d at 847, and one more did so in *Kiewit,* 981 F.2d at 531. They in turn follow numerous other judges who similarly ruled in cases going back 10 years. Therefore, the rule must be considered well-settled and considerations of stare decisis strongly impede revisiting and revising it.

B. *Purposes of the CDA and the certification requirement.* The dissent argues nonetheless that, per the critics, litigation over this issue "accomplishes nothing but delaying the *fair* consideration of the contractors' claims, a result contrary to the fundamental purpose of the CDA which is to provide fair and expeditious resolution of Government disputes." Dissent, at 1567 (emphasis added). This statement may be somewhat unclear or misleading in two respects. First, as to what litigation "accomplishes," the answer is compliance with the command of Congress, *i.e.*, enforcement of the statute, as written, as explained below. Second, although litigation over the certification requirement may in some cases push back the date from which various contractors are entitled to interest on their recertified claims if they prevail, contrary to the dissent, it does not necessarily or routinely prevent and need not substantially delay consideration of the merits of the claims themselves.[13] Finally, there is no necessary connection between "fair" resolution of the claim and the existence or non-existence of an issue concerning jurisdiction and certification. In any event, if the contractor had followed the plain and specific if narrow terms of the 1980 FAR, no delay at all could have followed. No one should have needed *Ball, Ball & Brosamer* in 1989 or *Grumman* in 1991 to know so.

Moreover, while the expeditious resolution of contract disputes is indeed one of the purposes of the CDA, it is plainly not the only purpose. The CDA, and in particular the certification requirement of section 605, serves other preeminent purposes as well. Congress expressly indicated that certification would serve to bind the contractor under civil fraud statutes as well as under contract law. S.Rep. No. 1118, 95th Cong.2d Sess. 7–8 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5241–42 (hereinafter "*Senate Report*"). As we observed before, the "regulation properly implements this objective by specifying the persons in the contractor's organization who may certify a claim." *Grumman*, 927 F.2d at 579 (quoting

*Ball, Ball & Brosamer*, 878 F.2d at 1429) (emphasis omitted). Thus, the certification requirement of the FAR furthers other important goals of the CDA and particularly of section 605 itself. As the specific substantive section in issue here, its purposes, clearly illuminated by legislative history, surely trump other general goals of the overall statute to the extent they are arguably inconsistent, particularly where the general goals are stated only in general, introductory and hortatory language, as they are here.

Congress was very clear about the purpose of certification. In a section of its report entitled, "Discouraging the unwarranted submission of contractor claims," the Senate Committee said that, according to Navy witnesses, a "substantial number of these outstanding claims were greatly inflated." *Senate Report* at 8, *reprinted in* 1978 U.S.C.C.A.N. at 5242. The Committee then noted: "In fact, some have been turned over to the Justice Department for *investigation of fraud.*" *Id.* (emphasis added). It then said: "Section 4(b) of the act is designed to specifically address the inflated claim problem by assigning *stiff penalties* to contractors who engage in such practice." *Id.* (emphasis added). The "penalties" referred to are for civil fraud, including under the False Claims Act, 31 U.S.C. § 231 et seq., which is specifically mentioned in the Committee Report. *Id.* at 20, *reprinted in* 1978 U.S.C.C.A.N. at 5254. In addition, section 4(b) itself authorizes the government to sue contractors for fraud, creating a cause of action in addition to those created by, for example, the False Claims Act. Hence, it is beyond serious argument that Congress intended the CDA to deter and redress fraud. Indeed, this court recently restated our precedent that the certification requirement as implemented by the FAR fosters that intent: "The requirement goes to the very 'integrity of the federal procurement system and the public fisc,' *Universal Canvas, Inc. v. Stone*, 975 F.2d 847, 850 (Fed.Cir.1992), by 'triggering a contractor's potential liability for a fraudulent claim under section 604 of the Act and thus discouraging the submission of un-

---

13. The exception may be in ship-building contracts where the special and short statute of

limitations of 18 months would often bar consideration of a recertified and resubmitted claim.

warranted contractor claims, *Ball, Ball & Brosamer,* 878 F.2d at 1429 (quotations, alterations, and citations omitted)." *Kiewit,* 981 F.2d at 533.

The Committee Report also references Admiral Hyman Rickover's testimony before two Senate subcommittees. Before the subcommittees Admiral Rickover stated that the CDA should require "the contractor [to] submit to the Government a certificate signed by a *senior responsible contractor official,* which states that the claim and its supporting data are current, complete and accurate." *Contract Disputes Act of 1978: Joint Hearings on S. 2292, S. 2787, and S. 3178, Before the Subcomm. on Federal Spending Practices and Open Government of the Senate Comm. on Governmental Affairs and the Subcomm. on Citizens and Shareholders Rights and Remedies of the Senate Comm. on the Judiciary,* 95th Cong., 2d Sess. 21 (1978) (hereinafter *"Joint Hearings"*) (emphasis added).

Lower-level officials, although often able to bind their corporation in contract, could not bind it in fraud in the context, for example, of large shipbuilding or other defense firms. Yet firms with these very contracts were the ones concerning which Congress expressly wanted to deter inflated or fraudulent claims. By appointing a lower-level official to certify claims, a contractor could seek to escape liability for fraud. The congressionally desired deterrence would then fail. Clearly, deterrence can only work if the certifier is senior enough or, if less senior, is directly involved enough in contract performance to make the corporation itself liable for any fraud.

Congress intended not only deterrence but also liability. Hence, the Senate Report includes a discussion of "stiff penalties" and the Committee's assertion that under section 4(b) a fraudulent contractor "shall be liable to the Government." *Senate Report* at 19, *reprinted in* 1978 U.S.C.C.A.N. at 5253. Indeed, our precedent has long recognized that Congress saw both deference and liability as important. *See Skelly & Loy v. United States,* 685 F.2d 414, 418 n. 11, 231 Ct.Cl. 370 (Ct.Cl.1982) (stating that the certification requirement "triggers a contractor's potential

liability for a fraudulent claim under section 604 of the Act"); *Folk Constr. Co. v. United States,* Ct.Cl. No. 99–80C, 1981 WL 21438 (order entered Jan. 16, 1981) (stating that "[t]he purposes of the certification requirement are to discourage the submission of unwarranted contractor claims and to encourage settlement"). Again, neither deterrence nor liability can work very well if a contractor is permitted to have lower-level or less directly involved officials certify claims. That is precisely what the FAR precluded. That it may have gone further than necessary does not destroy its efficacy to accomplish these congressional purposes.

Moreover, the Admiral's emphasis on "a senior responsible contractor official" implies far more than simply that the certifier have personal knowledge of all the details, which the dissent implies was Admiral Rickover's sole concern. Indeed, most of the Admiral's testimony concerned contractor fraud against the government. He analogized contractor certification to taxpayer certification. In both cases, a senior official must sign if the corporation is to be held accountable and subject to "stiff" civil penalties. No one would reasonably argue that any mid-level official who can execute a small contract for routine supplies for a big defense contractor can also sign its corporate federal tax returns and thereby expose it to civil liability for tax fraud. Yet the dissent cites the Admiral's analogy to signing tax returns as if it supported the dissent's assertion. It does not. On the contrary, it supports the FAR requirements of higher level or more involved officials.

After testifying at length about the fraud problem, "Admiral Rickover ... submitted written suggestions for amending the Act, which were reprinted in the report of the hearings in the middle of his testimony and which were substantially similar to the actual language of sections 6(c)(1) and (2)." *Lehman,* 673 F.2d at 355. One of the Admiral's written suggestions was that the bill be amended, as it was, to provide that:

> For claims of more than $50,000, the contractor shall certify that the claim and supporting data are current, complete and accurate when the claim is submitted, and

also certify that the conclusion in the claim accurately reflects the contract adjustment for which the contractor believes the Government is liable.

*Joint Hearings* at 13. We have previously construed his intent:

> Admiral Rickover wanted to deter contractors from filing inflated claims which cost the government substantial amounts to defeat. He sought to do so by subjecting contractors to financial risk if their claims were unreasonable.... Admiral Rickover viewed the *certification* requirement as a *necessary prerequisite* to the *consideration of any claim.* The provisions Congress adopted to include the certification requirement were based upon Admiral Rickover's written suggestions and fairly must be deemed to have incorporated his view concerning the effect of the certification requirement.

*Lehman*, 673 F.2d at 355 (emphasis added).

As discussed above and as prior decisions such as *Lehman* and *Ball, Ball & Brosamer* have noted, the legislative history conclusively establishes that fraudulent claims were at the core of Rickover's and Congress' concerns. As we noted, requiring a high-level official to sign the certification would deter fraud because by his signature such officer would expose the corporation to potential liability under civil fraud statutes. Rickover's concerns were the paramount motivation for the addition to the CDA of the certification requirement by amendment on the Senate floor on the day of its passage. *See* 124 Cong.Rec. 36,267 (1978) (Senator Byrd, sponsor of the amendment, stated that section 5(c) of the Act, which includes the certification requirement, "has been amended due to the concerns expressed by ... Admiral Rickover...."). His concern is plainly well met by the FAR which requires certification for corporations by higher-level or more directly involved officials rather than merely any employee with authority to bind the corporation in contract. The FAR does no more than demand Admiral Rickover's "senior responsible contractor official." Implementing the statute, it does no more than make proper certification, in Admiral Rickover's words, a "necessary prerequisite to

the consideration of any claim." *Lehman*, 673 F.2d at 355. It is therefore entirely consistent with the legislative history that illuminates congressional intent in adding the certification requirement. As such, the FAR is a reasonable construction of section 605 within the meaning of *Chevron*. Therefore, we are required to accept it without regard to the possibility it could have been written to include more officials while still achieving the congressional purposes.

### III. Certification as a Jurisdictional Prerequisite

*A. Long-established and uniform precedent.* The focus of the dissent's challenge to the rationale of the 10–year line of cases it lumps with *Grumman* is its assertion that the certification requirement should never have been deemed a jurisdictional prerequisite. If *Grumman*'s restatement of established and binding precedent that the certification requirement is jurisdictional were to be altered, however, much more than just *Grumman* would have to be overruled. *Grumman* merely followed the unbroken line of our precedent going back 10 years that so held; at considerable cost to stare decisis, all of these cases would have to be overruled too. In recent times, the cases include *Kiewit, Universal Canvas*, and *Ball, Ball & Brosamer.* The earlier cases were listed in *Grumman:*

> *Thoen v. United States*, 765 F.2d 1110, 1116 (Fed.Cir.1985) ("Congress has determined that submission of a certified claim to the contracting officer in the first instance is a *jurisdictional prerequisite....*"); *W.M. Schlosser Co. [v. United States]*, 705 F.2d [1336] at 1338 [ (Fed.Cir. 1983) ] ("Unless the claim was certified when it was submitted to the contracting officer, the Board should have neither heard nor ruled on the appeal."); *Milmark Servs., Inc. v. United States*, 231 Ct.Cl. 954, 956 (1982) ("It is well established that without such a formal claim and final decision by the contracting officer, there can be no appeal to this court under the CDA. It is a *jurisdictional requirement.* "); *W.H. Moseley Co. v. United States*, 677 F.2d 850, 852, 230 Ct.Cl. 405 ("Since plain-

tiff failed to certify its claim as required by section 6(c)(1) of the Contract Disputes Act of 1978, we are *without jurisdiction* to consider its direct appeal to this court."), *cert. denied,* 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982); *Paul E. Lehman, Inc. v. United States,* 673 F.2d 352, 355, 230 Ct.Cl. 11 (1982) ("Unless [the certification] requirement is met, there is *simply no claim* that this court may review under the Act.").

*Grumman,* 927 F.2d at 579 (emphasis added).

Rather than argue the merits of why, under particular language of the statute or legislative history, the certification requirement should not be deemed a jurisdictional prerequisite, the dissent merely challenges the lack of analysis in *some* of the later cases. Echoing industry critics, the dissent states: "[T]he cases that have considered the issue simply cite to earlier decisions with little or no analysis of their own." Dissent, at 1568. Only one example, *Lehman,* however, is given by the dissent. But *Lehman,* decided in 1982, is not one of the later cases citing to earlier decisions, but one of the earliest decisions. *Id.* Second, relying on a brief of the National Security Industrial Association (NSIA), the dissent states that "*Lehman* never discusses the issue of jurisdiction." *Id.* While it is true that *Lehman* never uses the word "jurisdiction" in connection with the certification requirement, it is not accurate to say that *Lehman* never treats jurisdiction. After a page and a half discussion of the statutory language and the legislative history of the certification requirement, *Lehman* concludes:

> The import of the language of the Act and its legislative history is that *unless* a claim has been *properly certified, it cannot be considered* under the statute. As we said in *Folk,* "The statute thus requires that to be *valid* a claim must be properly certified." Unless that requirement is met, there is simply *no claim that this court may review under the Act.*

673 F.2d at 355 (emphasis added). Not only does this statement plainly concern jurisdiction, but the page and a half discussion leading to this conclusion certainly qualifies as a discussion and analysis of the jurisdictional issue. In any event, while the lack of a complete analysis in some of the later cases may be frustrating and may require the reader to refer to the earlier cases, it hardly renders the court's continuing conclusion in all of these cases erroneous. Indeed, the implication of stare decisis is that settled issues need not be reanalyzed in every successive case.

B. *Legislative history.* The dissent quotes attorney argument that the jurisdictional nature of the certification requirement "runs directly afoul of the express intent of Congress to divest the *agencies* of their previous power to define the jurisdiction of the boards through disputes clause requirements and regulations." Dissent, at 1568 (emphasis added). First, the FAR is not promulgated by the "agency," here the Navy, but by a government-wide procurement authority, OFPP, specially mandated by Congress itself to implement the CDA. Second, the dissent cites no supporting statutory language or legislative history.

Simply put, there is nothing in the legislative history indicating error in the Federal Circuit and Court of Claims' continuing conclusion for more than 10 years that the certification requirement is jurisdictional. In fact, the dissent quotes a portion of the legislative history that suggests quite the contrary. As the dissent noted, Admiral Rickover testified that the Act should require "as a matter of law that *prior to evaluation of any claim,* the contractor must submit to the Government a certificate signed by a senior responsible contractor official." *Id.* at 1565–66 (emphasis altered). Certainly, that portion of the legislative history supports the conclusion that the certification requirement was intended to be jurisdictional, not the dissent's express view that Admiral Rickover did not view certification as jurisdictional.

C. *The statute.* Indeed, the statutory language of the CDA itself strongly suggests the same conclusion. As analyzed in *Lehman,* 673 F.2d at 354, the contracting officer's statutory authority (and obligation) to issue a decision arises *only* after the officer has received a "certified claim," 41 U.S.C. § 605(c)(2). And the right to appeal to an agency board of contract appeals, or to file

suit in the Claims Court is, in turn, expressly conditioned by the Act itself upon the "receipt of a contracting officer's decision *under section 605,*" 41 U.S.C. § 606 (emphasis added). Thus, taken together these two provisions of the statute practically compel the conclusion that the certification requirement was indeed meant to be jurisdictional. This conclusion is all the clearer when one considers that unlike courts which have inherent judicial power under article III of the Constitution, contract boards have only the limited authority expressly granted by statute. *Lehman*'s conclusion, quoted above, is therefore not only legally sound but also logically required. *See also Skelly & Loy,* 685 F.2d at 418 (stating that "[s]ince the Act specifies that certification is to take place in the first instance—on submission of a claim to the contracting officer—a contractor who did not so certify would not only be *barred* from the direct access route [of judicial review], but from the board route as well" (emphasis added)). Obviously, the bar arises from the fact that certification is, per section 606, jurisdictional.

D. *Effect of jurisdictional nature of certification requirement.* The dissent concludes by suggesting that the *Grumman* panel overstepped proper bounds in deciding the jurisdictional issue in that case because the case could and should have been dismissed merely for failure to state a claim upon which relief could be granted. That suggestion represents a fundamental misstatement of the rules of precedence governing issues of jurisdiction. Before a court may determine whether a claimant has stated a claim upon which relief can be granted, it must first determine whether it has jurisdiction to make *any* determination over the particular dispute. If not, it is without authority to determine whether the claimant has adequately stated its claim, or to make any other determination. Thus, the dissent's characterization of *Grumman*'s discussion of jurisdiction as mere "dicta" is unfounded. Dissent, at 1573. Moreover, the authorities that require deciding jurisdiction before the sufficiency of the complaint are so long, and well and clearly established as to require no citation.

The dissent also repeats concerns expressed by the Shipbuilders Council over the possibility of last-minute government manipulation: "[F]irst, the agency through its contracting officer, permits the appeal to be filed by issuing a final decision, but then later, through *its* litigation counsel, contests the validity of the certification by a post hoc reapplication of the regulation and demands dismissal." Dissent, at 1568 (emphasis added). The dissent asserts that "this is the exact circumstance that occurred with Newport." *Id.* The issue raised by the Council's concerns, however, cannot be dispositive, for any implication of bad faith is unjustified on the undisputed facts. Of course, the contracting officer is not a lawyer. Moreover, both agency counsel and Justice Department attorneys have an affirmative duty to raise jurisdictional issues. As this court recently said in yet another application of *Grumman* and *Ball, Ball & Brosamer,* "All participants have a duty to assure there are no jurisdictional impediments at the earliest possible stage." *Universal Canvas,* 975 F.2d at 850. Justice Department and agency counsel, of course, do not enter the case until *after* the complaint is filed in the Claims Court. Similarly, until an appeal is filed before a contract board, litigation counsel from the agency are not involved. Thus, they have no earlier opportunity than the appeal to a contract board or the filing of a Claims Court suit to litigate this issue. Therefore, the dissent's reference to "the agency" and "its counsel" is inaccurate.

IV. *The FAR Reasonably Interprets Sections 605–06 of the CDA and the Meaning of the FAR Is Plain*

Furthermore, as we observed in *Grumman,* our court is not the regulator. In interpreting a regulation, the court must look to the language of the regulation and the language and legislative history of the statute which the regulation implements. That is explicitly what was done in *Ball, Ball & Brosamer* and in *Grumman.* As long as the regulation is *a* reasonable one, not necessarily the only or the *most* reasonable one, it warrants *Chevron* deference. Controlled by earlier decisions, the *Grumman* court again

held it was reasonable. And, if the new regulation discussed in detail in the dissent is wiser and more practical than what it replaces, that does not establish that its predecessor was unreasonable.

Finally, in arguing that the FAR is unreasonable, the dissent quotes the July 22, 1991 issue of the Federal Contracts Report as stating that the FAR "effectively preclude[s] all but those at the CEO level" from certifying claims. Dissent, at 1571. This statement entirely ignores the first prong of the FAR, which allows "[a] senior company official in charge at the contractor's plant or location involved" to certify claims. In *Grumman*, this court expressly considered whether the FAR is a "CEO Only" rule and concluded that it is not. "[C]ertification by a CEO is not required by the regulation or by anything said in either of this court's opinions in this case. Indeed, any such requirement would read the first [prong] completely out of the regulation." 927 F.2d at 581. Moreover, our subsequent case law also shows that the FAR is not a "CEO Only" or CEO and equivalent rule. *See, e.g., Ingalls Shipbuilding, Inc. v. O'Keefe*, 986 F.2d 486 (Fed.Cir.1993) (allowing certification by Ingalls' Vice President of Administration).

At this point, Congress has amended the law so that the certification requirement can be met *after* filing in the board or Claims Court, but proper certification is still required before the claim may be adjudicated. Court of Federal Claims Technical and Procedural Improvements Act of 1992, Pub.L. No. 102–572, § 907, 106 Stat. 4516, 4518–19. The dissent simply presumes that by amending the statute Congress simply made express what it had always intended and thereby "corrected" an error by this court. Such presumptions, however, are not warranted. Rather, the congressional action simply shows that the elements of the bar and industry were successful in lobbying Congress to change a law which they found inconvenient. Moreover, that the 1992 amendments are expressly made prospective only hardly supports the contention that in 1978 Congress had not intended the CDA certification requirement to be jurisdictional. Finally, that Congress did not change the operative language, but simply mandated in 1992 that henceforth the certification requirement of the 1978 CDA shall no longer be considered jurisdictional as of the date of filing does not establish that the original language was not intended by the enacting Congress to be jurisdictional as of that date, as our precedent holds.

Additionally, the amended FAR has, or will soon become effective. Thus, the regulator has acted by broadening those who may certify to include any official designated in writing by the Board of Directors. This amendment preserves the exposure of the corporation to civil fraud penalties while increasing flexibility of companies to choose who will certify. It therefore appears to be a significant improvement over the original. Certainly, it represents much study and consultation with contradicting agencies by OFPP. That is exactly as it should be, for the task of improving regulations is committed in our legal system not to courts but to the regulators.

Congress too has now acted, fulfilling its own proper role; it has changed the law. Thus, the "certification problem" that so concerned the dissent has been resolved. And therefore any call to take this case *in banc* to revisit the *Grumman* issue, even if permissible under Fed.Cir.R. 35, seems all the less persuasive. In any event, as explained earlier, the requirements of Rule 35 plainly are not met. Finally, while its effect has been ameliorated by Congress, *Grumman* has not been shown erroneous by the dissent. Neither has the decision in this appeal.

## CONCLUSION

For the reasons stated above, the decision of the ASBCA in No. 33244, 91–2 BCA ¶ 23,-865, *reconsideration denied*, 91–3 BCA ¶ 24,-132 (1991), is

*AFFIRMED.*

BENNETT, Senior Circuit Judge, dissenting.

I respectfully dissent. This case seems to raise, and is mechanically controlled by, the interpretation of the Contract Disputes Act (CDA) certification requirement as jurisdic-

tional, espoused in this court's opinion in *United States v. Grumman Aerospace Corp.,* 927 F.2d 575 (Fed.Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991). I believe this view should be revisited in light of the growing amount of criticism leveled at it and the successful legislative and regulatory efforts to circumvent it. Although *in banc* consideration was sought and denied in *Grumman,* with a dissent being published from the decision to not consider it *in banc,* circumstances have changed dramatically as a result of *Grumman*'s many adverse effects on government contracting practice.

I speak of *Grumman* as a convenient reference, and to other cases before and after it, relied on by the majority, which raise the central question of this dissent that certification should not be a jurisdictional question, as there held. The present case is a convenient one to disavow the now congressionally rejected earlier errors in judgment, repeated by the majority here, *i.e.,* that proper certification is a jurisdictional requirement. I wish to imply no criticism of certification itself for I think Admiral Rickover's suggestion for it was splendid as a guard against false or fraudulent claims. Interpretation by the regulation implementing the statute, and board and judicial decisions, however, go beyond the admiral's recommendation · as adopted and understood by Congress, as it has now been made clear by legislation in 1992, later discussed. Personal aspersions are not intended to be cast against those who see the requirement of proper certification differently from Admiral Rickover and the Congress. But, the latter's views, I submit, are entitled to more respect than we have afforded them. It is intended here to make a record in this court that some of us do recognize the unfortunate consequences of the position taken by the court and that, in light of evidence now, there are viable grounds to reconsider what has been done. Failure to recognize the problem earlier has caused Congress to do it for us in future cases, shown hereinafter. That is the ultimate embarrassment to the court. I call it an "end run" around adherence to discredited and flawed precedent. The bell has rung and the court should listen, look, and learn from its errors.

In a March 4, 1991 decision, the ASBCA granted the Navy's motion to dismiss the present case, ruling that Newport's claim had not been properly certified under 41 U.S.C. § 605(c)(1) and 48 C.F.R. [FAR] § 33.-207(c)(2) because it had been certified by Newport's controller, Mr. Burling, who, in light of this court's decision in *Grumman,* was not a proper certifying official. I accept the majority's statement of the essential background facts.

This court's decision in *Grumman* has unleashed a wave of protests and efforts to circumvent the rule it enunciated. This opinion includes a summary of the typical reactions by the bench, the bar, and the administrative community in opposition to *Grumman* and the efforts to vitiate its stultifying effects on Federal Government procurement.

The broad general purposes of the CDA were to provide:

> a fair, balanced, and comprehensive statutory system of legal and administrative remedies in resolving Government contract claims. The act's provisions help to induce resolution of more contract disputes by negotiation prior to litigation; equalize bargaining power of the parties when a dispute exists; ... and insure fair and equitable treatment to contractors and Government agencies.

Senate Comm. on Governmental Affairs & Comm. on the Judiciary, S.Rep. No. 1118, 95th Cong., 2d Sess. 1 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235.

The certification requirement of the CDA (section 605(c)(1)) was added through an amendment offered by Senator Robert C. Byrd (124 Cong.Rec. S18640 (1978)). The Senator's statement was that the certification requirement was intended to address concerns expressed by Admiral Hyman G. Rickover. Admiral Rickover had testified during hearings that the Act should include and require,

> as a matter of law that prior to evaluation of any claim, the contractor must submit to the Government a certificate signed by a *senior responsible contractor official,*

which states that the claim and its supporting data are current, complete and accurate.

Contract Disputes Act of 1978: Joint Hearings on S. 2292, S. 2787, and S. 3178, Before the Subcommittee on Federal Spending Practices and Open Government, 95th Cong., 2d Sess. 21 (1978) (emphasis added). Congress codified Admiral Rickover's suggestion in the CDA at 41 U.S.C. § 605(c)(1) which states, in pertinent part:

> For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

The regulation which purports to implement the statute's policy, FAR § 33.207(c)(2) states, in pertinent part:

> If the contractor is not an individual, the certification shall be executed by—
>
> (i) A senior company official in charge at the contractor's plant or location involved; or
>
> (ii) An officer or general partner of the contractor having overall responsibility for the conduct of the contractor's affairs.

This court in *Grumman* held that the treasurer of Grumman Aerospace Corporation, Mr. Paladino, who was also a senior vice president of finance of Grumman's Aircraft Systems Division, was not a proper person to certify Grumman's claim for reimbursement of disallowed employee compensation costs on 43 reimbursement contracts. The panel (Markey, C.J., Miller and Michel, JJ.) dismissed Grumman's claim for lack of subject matter jurisdiction, ruling that Mr. Paladino was neither "in charge" of the plant where the contract was performed, nor did he have "overall responsibility" for the contractor's affairs. Further, the court perpetuated the idea that the certification requirement should be considered as a jurisdictional prerequisite "that must be satisfied by the contractor before it may appeal the contracting officer's claim denial." *Grumman*, 927 F.2d at 579. The panel found that the regulation is entirely consistent with section 605 of the CDA, that it "fills in the gap left by Congress."

Judges Plager, Rader, Newman, and Lourie dissented from the court's decision not to take *Grumman in banc*, arguing that the purpose of the certification requirement, as evidenced in the legislative history, is to prevent fraudulent claims and encourage settlements, and contemplates that the certifier must be an official able to speak for and bind the company regarding the claim. The dissent further maintained that the regulation goes beyond a reasonable interpretation of "contractor" by narrowing the range of officials able to certify. Additionally, the dissent recognized that the government's position "sets a trap for the unwary," requiring claims to be recertified and thereby giving the government more time to avoid paying its debt as well as denying the contractor interest on the money due.

Grumman petitioned for certiorari and received support from five amici, among them the Federal Circuit Bar Association. The Supreme Court denied certiorari on October 15, 1991. — U.S. —, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991).

In one example of forced adaptation in the wake of the *Grumman* decision, the ASBCA has found it necessary to implement a program by which all pending appeals of claims for more than $50,000 are reviewed specifically and separately for certification validity.[1]

1. An article in the ABA's Public Contract Newsletter stated: "Adjudicating the validity of a contractor's certification threatens to displace resolving disputes on the merits as the primary function of the Armed Services Board of Contract Appeals (ASBCA)." Volume 27, No. 2, Winter 1992, at 3. The article continued, stating "there has been a sudden and dramatic increase in litigation over one particular aspect of certification—who may certify a claim on behalf of a corporate contractor—since the United States Court of Appeals for the Federal Circuit's ruling in *United States v. Grumman Aerospace....*" *Id.* In the first ten months of 1991, 145 of the ASBCA's 441 published decisions discussed the validity of the contractor's certification, besides the volume of unpublished orders and decisions. *Id.* at 4. The article further stated: "In light of the technical interpretations of the CDA's procedural requirements, resulting in needless delays and wasted resources, something needs to be

In another recent example of the fatuity propagated by the *Grumman* regulation, the ASBCA held that because the regulation requires that the certification be accomplished by "a senior company official in charge at the contractor's plant or location involved," a vice president of the contractor cargo shipping company could not certify the claim for reimbursement of certain port charges because he was not physically present on the high seas where the contract activity was considered to have been performed. The board held that the corporate office of the shipping company was not the location of the primary contract activity, but that the actual work took place on the high seas rather than in any specific port, thus requiring the vice president to have been in charge on the transport ship to have validly certified the claim. *Appeal of American Transport Line, Ltd.*, ASBCA 39984, 92–2 BC ¶ 24,811, 1992 WL 34021. Under *Grumman* there may be no appropriate senior company official to certify a claim!

These examples of extra substantive work and unreasonable interpretation as a result of *Grumman* in and of themselves are illustrative of how the certification requirement, as currently interpreted by this court, has become a Frankenstein, originally intended to be a procedural afterthought added to the CDA on the suggestion of Admiral Rickover and now grown into a substantive monstrosity, draining resources and time, allowing government agencies to abuse contractors and clearly growing beyond its intended scope.

In its petition for certiorari, Grumman stated that the Federal Circuit's decision in *Grumman* "is not only unprecedented, it is also inconsistent with the language of the regulation and conflicts with the statute which the regulation purports to implement," and that the decision "condones and resurrects the very wrong that Congress legislated against when it passed the CDA—manipu-

lation of the jurisdiction of the contract dispute forum by the agencies opposing contractor claims."

The Federal Circuit Bar Association (FCBA) and the other four amici to Grumman's certiorari petition (Aerospace Industries Association of America, Chamber of Commerce of the United States, the National Security Industrial Association, and the Shipbuilders Council of America) unanimously expressed the view that this court's decision in *Grumman* frustrates the purposes of the CDA. The Federal Circuit Bar Association pointed out in its brief that validity of certification has been litigated in approximately 100 cases before this court, the Claims Court[2] and the Court of Claims and that the administrative tribunals are much more bogged down with these cases. In June 1991 alone the ASBCA published nine decisions addressing this issue. This waste of resources, according to the Association, accomplishes nothing but delaying the fair consideration of the contractors' claims, a result contrary to the fundamental purpose of the CDA which is to provide fair and expeditious resolution of government disputes. The FCBA also stressed that the jurisdiction of the Claims Court and agency boards is not dependent upon the certification of the claim, stating that "[t]he sole jurisdictional prerequisite for an appeal under the CDA is a final decision of a contracting officer."

The Chamber of Commerce called upon the Supreme Court to "restore the fair and efficient system Congress intended to create," stating that "[t]welve years of mindless litigation is enough." The Chamber of Commerce also headed up a proposal on the part of the defense industry (and the other amici on the certiorari petition) to amend the FAR to state that it would allow certifications to be executed by a person authorized to bind the contractor with respect to the claim.

The National Security Industrial Association (NSIA) argued that in examining the

---

done. When one fishes for sharks but catches only porpoises, it is time to change the nets to allow the porpoises to escape with as little damage as possible." *Id.* at 5–6.

2. The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506,

4516, changed the name of the United States Claims Court to the United States Court of Federal Claims. However, for purposes of this dissent, I shall refer to the "Claims Court" since that was the appropriate designation at the time this case was appealed.

provisions which Congress set out, delineating the subject matter jurisdiction of the boards in section 607(d) of the CDA and establishing the Claims Court's jurisdiction to hear appeals from contracting officer decisions under the Tucker Act, 28 U.S.C. § 1491, "[t]here is absolutely no language in . . . these statutory provisions to indicate that the ·CDA's claim certification requirement was intended to limit the statutorily established authority of agency boards of contract appeals or the Claims Court to review final contracting officer decisions under the CDA." The NSIA aptly points out that although this court's panel in *Grumman* termed it "well-settled" that the CDA's certification requirement is jurisdictional, the cases that ·have considered the issue simply cite to earlier decisions with little or no analysis of their own. As an example, the NSIA cites the *Lehman* case which, although typically cited as one of the dispositive cases on this issue, *Lehman* never discusses the issue of jurisdiction, and its reasoning more soundly suggests "that a contractor's failure to submit a properly certified claim presents a board of contract appeals ·or the Claims Court with a claim upon which relief cannot be granted." Both the NSIA and the FCBA observe that this court's decision in *Grumman* effectively allows the. Office of Federal Procurement Policy (OFPP) to establish the jurisdictional boundaries of the Claims Court, which is clearly inappropriate.

The Shipbuilders Council states that the *Grumman* decision "runs directly afoul of the express intent of Congress to divest the agencies of their previous power to define the jurisdiction of the boards through disputes clause requirements and regulations." Further, the Council also charged that the *Grumman* opinion leaves an agency "free to manipulate at will the jurisdiction of a board, or the Claims Court, within a single case to the prejudice of the contractor: first, the agency, through its contracting officer, permits the appeal to be filed by issuing a final decision, but then later, through its litigation counsel, contests the validity of the certification by a post hoc reapplication of the regula-

tion and demands dismissal." As of course is obvious and without definitively opining as to the government's intent to manipulate in the present case, this is the exact circumstance that occurred with Newport.

The AIA states that the central irony of the panel's opinion is that "it finds Congress's use of the word 'contractor' in the CDA to be ambiguous, justifying a regulation, while it finds that OFPP's regulation 'is unambiguous and must be applied literally.' " According to AIA, the ambiguities of the regulation ·"make predicting the validity of the certification for a given claim impossible."

At whatever stage in the proceedings, however late, the government raises an issue that the certificate is not proper, the contractor must return to the CO, recertify the claim, and begin the process over again. The government has the power to sap the strength of the contractor and deny it the recovery of interest by springing the defective certificate late in the game. I question whether it is in the government's best interest to deprive a contractor of just compensation in such circumstances.

As reported in the November 11, 1991 issue of the Federal Contracts Report, the Office of Federal Procurement Policy's administrator has asked selected federal agencies to comment on a draft policy letter which would substantively amend and clarify the FAR requirement as to who may certify contract claims when the contractor is not an individual. The draft letter would amend the May 9, 1980 OFPP Policy Letter 80–3 (45 Fed.Reg. 31,035 (1980)), which originally set forth the claims certification requirement now incorporated in FAR at 48 C.F.R. § 33.-207(c)(2). The new draft language would permit certification by: (1) any general partner; (2) any officer elected or appointed by the board of directors or governing body; or (3) any employee, other than a general partner or officer, who is authorized by the contractor to certify claims, which authorization could be accomplished by resolution of the board of directors or written authorization by an officer.[3] It is stated that in drafting this

---

**3.** OFPP proposes to replace the existing regulation with the following language:

If the contractor is an individual, the certification shall be executed by that individual. If

language, account was taken of the proposals made by the amici in *Grumman* and the suggestions of other interested parties, like the ABA.[4]

Although if adopted, this proposed language would eliminate some of the ambiguities involved in the certification of corporate claims, it does not address the fact that the certification requirement is still considered to be a jurisdictional prerequisite, another point which *Grumman* detractors, including its dissenters, have decried. Among those detractors, Chairman Paul Williams of the ASBCA has been of the opinion that even though a regulatory change would eliminate some of the problems that face the ASBCA after *Grumman*, there are other problems which would still require a legislative fix, namely, the jurisdictional nature of certification, which as currently interpreted can effectively bring ongoing proceedings to a halt because jurisdiction may be raised at any time.[5]

In an effort to remedy this problem, the Claims Court submitted legislation to the House and Senate Judiciary Committees which would establish that proper CDA certification is not a condition of subject matter jurisdiction (Claims Court Technical and Procedural Improvements Act of 1991). The legislation specifically proposed to amend 41 U.S.C. § 605(c) to state that claim certification requirements are not intended to be a prerequisite to court jurisdiction but are rather curable statutory requirements which would be waivable by the government in appropriate cases. The legislation further provided that an absence of or defect in the certification discovered after a claim is in litigation could be cured by the contractor, thus avoiding the need to repeat the entire administrative claim process. The Federal Courts Study Committee Implementation Act of 1992 (S. 1569), which proposed to enact recommendations of the Federal Courts Study Committee, in addition to those incorporated in the Judicial Improvements Act of 1990, incorporated provisions of the Claims Court's bill, including the certification/jurisdiction issue.

---

the contractor is not an individual, the certification shall be executed by:
(i) Any general partner of a partnership in which all the general partners are individuals;
(ii) Any officer elected or appointed by the contractor's governing body (the board of directors where there is such a board); or
(iii) Any employee who is duly authorized by name or by position, without the power of redelegation, to bind the contractor in certifying Contract Disputes Act claims as the result of:
 (1) A written resolution by the contractor's governing body (the board of directors where there is such a board); or
 (2) In the case of a contractor composed of two or more parties (such as corporations) that lacks a governing body:
 (a) The written agreement establishing the contractor; or
 (b) A written resolution by each member party's governing body (the board of directors where there is such a board).
The Letter included two pages of Supplementary Information "to highlight the mechanics of the proposed certification language as it applies to non-individual contractors," including explanations of certification requirements as applied to officers, authorized employees, joint venture contractors, partnerships, state, local and foreign government contractors and contractors in bankruptcy.
Notice, Office of Management and Budget, Office of Federal Procurement Policy's Request for Comments on a Proposed Amendment to OFPP Policy Letter 80–3, March 10, 1992, 57 FR 8495–04.

4. The ABA Section of Public Contract Law, meeting in conjunction with the annual ABA meeting in Atlanta, August 10, 1991, had approved a proposal to revise the FAR so that the claim could be certified by a general partner, a board-elected official, or an official of the contractor authorized by the board to certify the claim.

5. Chairman Williams further stated that until the certification requirements are clarified there is the potential for abuse by both sides, in that either party could wait for the case to be decided on the merits and if dissatisfied with the result, then allege a defective certification [just as happened in the current *Newport News* case]. *See Universal Canvas, Inc. v. Stone, Secretary*, 975 F.2d 847 (Fed.Cir.1992). One of the main flaws in the *Grumman* decision, according to Williams was that even though the panel maintained that it was not espousing a "chief executive officer's only" rule for certification, neither did the panel offer any guidance as to which other individuals may qualify under the second prong involving "overall responsibility for the conduct of the contractor's affairs." Paul Williams, *Certification of Contractor Claims after United States v. Grumman Aerospace*, Public Contract Newsletter, Winter 1992, at 3.

On April 2, 1992, Senator Howell Heflin introduced a bill (S. 2521) to amend S. 1569. Under Senator Heflin's amendment, certification of a claim under the CDA would not be jurisdictional, and would allow technically defective certifications to be amended under certain conditions. Hearings on the bill were held on April 29, 1992, at which, among others, Chief Judge Loren A. Smith of the United States Claims Court, testified. As a result of modifications suggested by many individuals and entities, Senator Heflin introduced further amendments on July 26, 1992, which had the approval of all of the members of the Judiciary Committee. Section 1109 of an amendment would amend 41 U.S.C. § 605(c) by making certification of claims under the Contract Disputes Act non-jurisdictional. Cong.Rec. S11236, August 3, 1992. Senator Heflin stated, in introduction of the amendment,

> [w]asteful and esoteric litigation over this issue has produced several hundred written and, oftentimes, conflicting opinions from various courts and agency appeals boards. The language I include today is the result of much discussion between the Administrative Conference, members of the Judiciary Committee, and the Claims Court.
>
> The language would not eliminate the certification requirement. The language would permit an agency board of contract appeals or court to allow a certification to be amended if there are reasonable grounds and so long as the certification was not made fraudulently, in bad faith, or with reckless or grossly negligent disregard of the Contract Disputes Act or applicable regulations. This section shall also have prospective application. . . .

*Id.* Senator Thurmond also commented on the bill, indicating his support for S. 1569 and Senator Heflin's amendment, stating:

> This legislation changes the requirement that a contractor must certify this claim pursuant to the Contract Disputes Act in order for the Claims Court to have jurisdiction over these disputes. The certification requirement is intended to prevent fraud and encourage settlement of disputes by requiring a contractor to certify that

the claim is honest and not inflated. Under current law, if a contractor fails to properly certify his claim, the claim is dismissed for lack of jurisdiction. There is simply no opportunity to amend the certification even if the impropriety is purely technical in nature.

> This bill does not do away with the certification requirement or its jurisdictional nature. The legislation will authorize an agency board of contract appeals or court to permit a certification that is technically defective to be amended unless the failure to properly certify was due to the contractor's fraudulence, bad faith, or reckless or grossly negligent disregard of the governing statutes or regulations. Therefore, a contractor who makes an honest mistake in the certification will not be penalized by having his claim dismissed. However, a contractor is still under a duty to abide by the governing statutes and regulations dealing with certification.

*Id.* at 11237. The bill (S. 1569) passed the Congress, as amended, and finally became law on October 29, 1992.

The Claims Court has been open in hostility to the *Grumman* decision. In *Shirley Constr. Corp. v. United States,* 23 Cl.Ct. 686, 689 (1991), Judge Horn stated in a case governed by this court's *Grumman* decision:

> Although as a judge of the United States Claims Court, I find myself bound by the precedent currently in force, and squarely on point on the issue of certification raised in the instant case, I am in total agreement with the language of the dissent in *Grumman.* I believe that Judge Plager and his colleagues are correct that the purpose of the certification requirement is to ensure that a claim is certified by a company official "able to speak for and bind the company regarding the claim." *Grumman,* 927 F.2d at 582. . . . And, I agree with the dissent that "the [majority] panel's pronouncement regarding what is required to certify a claim is not good law." . . . .
>
> This court and other judicial bodies spend far too much valuable time hearing motions to dismiss, brought by the government to challenge jurisdiction in government contract cases on the basis of faulty

certification, only to find the very same cases refiled, at a later date, following additional administrative procedures to conform with the certification requirements of the statute and the regulations. The result is an inefficient use of the time of the courts, the government and the plaintiffs.

... This judge would welcome a new approach, by either the United States Court of Appeals for the Federal Circuit or by the Congress, which directs that failure to certify in accordance with the very narrow requirements currently in force is not jurisdictional. It is widely recognized that the litigious nature of our society has overextended the resources of the courts and adds an economic burden on business of all sizes through costs of litigation. Here, is a sensible and simple opportunity to ease all those burdens.

Subsequently, in *Aleman Food Services, Inc. v. United States,* 24 Cl.Ct. 345 (1991), Judge Horn again evidenced her dissatisfaction with *Grumman* (and with the government's procedures in challenging certification, noting that the government's motion, as in *Newport,* was filed at the "eleventh and a half hour" of the case, just before the pretrial filings were due and right before the commencement of the trial). The judge stated in part:

This court is not one which favors the certification requirement in its current form, as it has been interpreted by the courts and parts of the government contract community. In fact, this court has previously made its position known in *Shirley Constr. Corp. v. United States....* The generally acknowledged, current state of the law, which holds that failure to certify is jurisdictional, however, has tied this and other courts up in unnecessary knots....

In general, this court is loath to put itself in a straight jacket and adhere blindly to a rigid, and perhaps unworkable, interpretation of the words "overall responsibility." ... this court believes strongly that a certification requirement must and can be devised which does not also legislate the manner in which private business entities are forced to set up their corporate structure.

24 Cl.Ct. at 352–53.

We are not bound by the opinions of the Claims Court. However, the views of those on the "firing line" are entitled to respect.

A July 22, 1991 issue of the Federal Contracts Report stated:

It is imperative that either the courts or Congress address this certification problem and return the certification procedure to the intent of the CDA. Even as outspoken a critic of contractor claims as Admiral Rickover stated in his recommendation that the certification provision be included in the CDA merely to "put the contractor in the same position as our working man, the income tax payer who must certify his tax return." Contract Disputes Act of 1978: Joint Hearings on S. 2292, S. 2787, and S. 3178, Before the Senate Governmental Affairs Subcommittee on Federal Spending Practices and Open Government, 95th Cong., 2nd Sess. 21 (1978). It is inconceivable that Admiral Rickover's recommendation that a claim be certified by a "senior responsible contractor official" would 12 years later be construed so narrowly as to effectively preclude all but those at the CEO level.

Until such time as either the courts or Congress address this issue, as strongly suggested by the dissent in *Grumman,* contractors should be aware of the narrowing range of acceptable certifiers when submitting a claim of more than $50,000 to the government. Accordingly, a contractor would be well advised to have all claims certified by the CEO until statutory, regulatory, or judicial remedy is fashioned.

Chairman John S. Pachter of the ABA's Public Contract Section, optimistically stated (Public Contract Newsletter, Vol. 27, No. 2, Winter 1992, at 15–16) that based on the Claims Court's and the OFPP's efforts to circumvent *Grumman,* "it is fair to say that reform is in the air. These bright signs may help bring order and rationality into the claims process and avoid the wasteful litigation that has regretfully been so typical in recent years."

It is clear from the range of criticisms which have been leveled at *Grumman* and from the actions which have been taken aimed at correcting the practical problems which arose out of *Grumman*, and like decisions, that this court should reevaluate the pronouncements there in order to bring the certification procedure into line with the clearly enunciated policies of the CDA ("to induce resolution of more contract disputes by negotiation prior to litigation; equalize bargaining power of the parties when a dispute exists; . . . and insure fair and equitable treatment to contractors and Government agencies") and, as Professors Nash and Cibinic urge us, exercise common sense.

## CONCLUSION

In the time that has elapsed since this case was argued in February 1992, the President signed into law on October 29, 1992, the Federal Courts Administration Act of 1992 (FCAA), Pub.L. No. 102–572, 106 Stat. 4506 (1992) (effective Jan. 1, 1993). The FCAA amended section 6(c) of the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613 (1988). Section 907(a) of the FCAA provides, in pertinent part, that:

(6) . . . A defect in the certification of a claim shall not deprive a court or an agency board of contract appeals of jurisdiction over that claim. Prior to the entry of a final judgment by a court or decision by an agency board of contract appeals, the court or agency board shall require a defective certification to be corrected.

(7) The certification required [under the CDA] may be executed by any person duly authorized to bind the contractor with respect to the claim.

The FCAA further provides in section 907(a)(7)(2) that the foregoing amendments "shall be effective with respect to all claims filed before, on, or after the date of the enactment of this Act, except for those actions which, before such date of enactment, have been the subject of an appeal to an agency board of contract appeals or a suit in the United States Claims Court." Congress thus went as far as it could without interfering in pending litigation.

There is more good news in the fact that the Office of Federal Procurement Policy (OFPP) has taken notice of this legislation and the reasons for it and has announced implementation of its views set forth in Policy Letter 80–3, *see supra* note 2, by amending and further simplifying the FAR to assure that what it describes as "substantial confusion and persistent litigation" will no longer contravene the CDA's avowed goal of ensuring the prompt and efficient resolution of disputes between contractors and the government. How, when, where, and by whom certification is to be accomplished, and defective ones corrected, is stated in clear language that does not restrict or expand the statute. The offending FAR is history and so is *Grumman*, its forebearers and offspring. 58 Fed.Reg. 5039–41 (1993). The effective date was 60 days from this publication in the Federal Register. Those concerned are referred to the Federal Register for the language used.

Thus, the criticisms of the certification provision as jurisdictional and the implementing regulation, outlined above in some detail for the record, are all expressly validated by congressional and administrative action, notwithstanding the failure of the court to do so to date. Of course, the new statute and FAR are not retroactive so as to cure the problem in the instant case. But, the court having created the problem earlier should take heed and correct it in pending cases. Putting an end to continuing waste in judicial and financial resources, and mischief so evident, would seem to be the fair and common sense thing to do since the *Grumman* line of cases made a certification defect jurisdictional, beyond congressional intent and the statutory language, as is now made clear by repudiation of that view in the 1992 legislation and its history.

Incredible as it may now seem, here we are still insisting in the present majority opinion that a defect in certification is a jurisdictional bar to relief and that it cannot be changed for any reason in a pending case. That idea disregards the weight of new evidence, described above, that the time is now here to take a fresh look at this proposition. I have changed my own mind in light of the

considerations set forth in this dissent, including the action of Congress on the subject. The majority opinion, however, belittles critics of the *Grumman* jurisdictional theory, and FAR objectors, as unworthy of judicial attention whether they are legal commentators, contract law professors, spokesmen for the government contract community, other courts and judges, contractors, the bar associations, the OFPP, or the Congress of the United States, among others. The Supreme Court is more flexible. Indeed, it is hard to find defenders of the jurisdictional bar theory anywhere but on the Federal Circuit. The astonishing, crippling effects of this congressionally recognized mistake interpreting the CDA are nevertheless regarded by its defenders as insufficient reasons to correct an announced holding as a matter of law. Be that as it may, the court can do so when legal error is recognized for whatever reason makes it "a question of exceptional importance." Fed.R.App.P. 35(a); Fed.Cir.R. 35(a).

In short, the effect of the certification as jurisdictional has been an erroneous interpretation of that provision of the statute in the opinion of most who have spoken or written about it, or had to live with it. Finally, the unsoundness of it is in the additional fact that *Grumman* need not have been decided on this basis at all, although it is enshrined by the majority as judicial holy writ, mainly because it was decided long ago and has been followed by those unwilling to look at it again. In *Grumman*, the contractor's claim was for $48,707, an amount below the certification requirement threshold of $50,000. *Grumman*, 927 F.2d at 577. Unfortunately, counsel overlooked this point and did not urge it on appeal. The court said it was too late to raise it for *in banc* consideration and refused to consider it, although admitting that subject matter jurisdiction may be addressed at any time. The court then disagreed with the board and held that the certifier was not qualified because he did not have "overall responsibility for the conduct of the contractor's affairs" and was not in charge at the contractor's "plant or location involved," as the regulation then required, applied literally. Thus, the court was presented with a claim on which relief could not then be grant-

ed. That was enough to decide the case. But the court took another and unnecessary step, as had been done in a few earlier cases, saying that certification was jurisdictional. Unfortunate consequences to the entire contract community followed, as described above. This dicta should be disregarded and *Newport* provides an opportunity to put this sad chapter behind us for reasons shown above, now recognized by the Congress of the United States and others concerned in the public contract community.

The majority in the present case cites other cases which have made the same legal error, relying on dicta in *Grumman* as authority to certify a contract claim for less than $50,000, contrary to the statute. This compounding of error cannot be defended. It is pertinent to note what Mr. Justice Holmes said, almost 100 years earlier, about the technique now followed in the present case:

> It is revolting to have no better reason for a rule of law than that … it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.

Oliver Wendell Holmes, *The Path of the Law*, 10 Harv.L.Rev. 457, 469 (1897).